UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SCOTT WILLIAM WOODBURY,

        Petitioner,               Case Number 01-10046-BC
                                            Honorable David M. Lawson

v.

BARBARA BOCK,

        Respondent,
_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

      Scott William Woodbury, a prisoner proceeding *pro se* who is presently confined at the Saginaw Correctional Facility in Freeland, Michigan, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his application, the petitioner challenges his conviction of one count of first-degree criminal sexual conduct. Mich. Comp. Laws § 750.520b. The petitioner was sentenced as a fourth felony habitual offender to a prison term of forty to ninety years for this crime. *See* Mich. Comp. Laws § 769.12. The petitioner has challenged his conviction on the grounds that his vehicle was seized without a warrant, his wife's statements regarding a prior bad act were admitted as evidence, and his trial counsel was ineffective for failing to call witnesses in his defense. The Court finds that none of the arguments has merit. The petition for writ of habeas corpus, therefore, will be denied.

I.

      The petitioner was convicted of first-degree criminal sexual conduct after a three-day jury trial in the Mecosta County, Michigan circuit court. The evidence at trial established that the petitioner forced the complainant, Valerie Wray, to perform oral sex on him, and he penetrated her with a beer bottle.

Ms. Wray testified that on June 18, 1997, the petitioner came to her sister's house, where she was staying, and asked her if she wanted to drink some beer with him. Trial Tr. Vol. II at 16-17. Ms. Wray agreed and they drove around in the petitioner's car for a few hours drinking beer, ending up on a two-track trail in rural Mecosta County. *Id.* at 18. When they reached the two-track trail, the petitioner told Ms. Wray to take off her clothes. *Id.* at 19. Ms. Wray initially refused, but complied after the petitioner threatened to kill her family with a gun he claimed was in his car. *Id.* at 20. Ms. Wray testified that the petitioner called her a "bitch" and a "slut," pulled her hair, told her to get on her hands and knees, unzipped his pants, and put his penis in her mouth after she told him "no." Tr. Vol. II at 20-21, 24.

Ms. Wray stated that the petitioner inserted a beer bottle into her vagina and then forced his penis into her mouth. *Id.* at 21. Ms. Wray further testified that the petitioner made her crawl on her hands and knees with no clothes on, he poured beer all over her, and he made her drink beer from where it spilled on the ground. *Id.* at 23, 25. Ms. Wray testified that the petitioner also inserted the beer bottle into her rectum. *Id.* at 25. The petitioner told her that he would kill her sister and future brother-in-law if she told anyone. *Id.* at 25-26.

After the petitioner and Ms. Wray returned to his car, a car full of teenagers drove up. Tr. Vol. II at 26. Ms. Wray mouthed the word "help" and the teenagers followed them and helped her escape from the petitioner's car. *Id.* at 27. Ms. Wray told the teenagers what had happened and they took her to her sister's house. *Id.* at 28, 31. Ms. Wray's sister called the police. *Ibid.*

Jason Kettel testified that on June 18, 1997, he and three friends, Justin Holliday, Kim Jordan, and Sarah Belding, were driving down a two-track road in Mecosta County when they saw a car parked far off the road. Trial Tr. Vol. I at 153. Mr. Kettel testified that they stopped to see if

anyone needed help. *Ibid*. While he was talking to the petitioner, Mr. Kettel noticed that Ms. Wray was crying. *Id*. at 154. As the petitioner was pulling out, Mr. Kettel heard his friends in the back seat say that Ms. Wray was asking for help. *Id*. at 156. Mr. Kettel ran up to the petitioner's car while it was moving away, asked the petitioner what he was doing and yelled to Ms. Wray to jump out. *Ibid*. Ms. Wray managed to get out of the car, and the petitioner sped away. *Id*. at 156-57.

Mr. Kettel testified that Ms. Wray seemed "stunned" and "tore apart" and was wearing only underwear and a tee shirt. Trial Tr. Vol. I at 157. Mr. Kettel testified that Ms. Wray was crying hysterically and told them that the petitioner had forced a beer bottle up her rectum and forced her to fellate him. *Id*. at 159. Ms. Wray also told Mr. Kettel that the petitioner threatened to kill anyone who found out about the incident. *Id*. at 160.

Justin Holliday and Kim Jordan corroborated Mr. Kettel's testimony. Mr. Holliday testified that the petitioner appeared nervous when Mr. Holliday pulled up next to the petitioner's car and began talking to him. Trial Tr. Vol. I at 189. Kim Jordan stated that Ms. Wray had mouthed the words "help me, help me," to her as the petitioner spoke to Mr. Kettel and Mr. Holliday. *Id*. at 212. Ms. Jordan testified that Ms. Wray told her that the petitioner had forced a bottle into her vagina and rectum, forced her to fellate him, and threatened to kill her. *Id*. at 213-14.

Sarah Belden also corroborated Mr. Kettel's testimony. Ms. Belden saw Ms. Wray mouthing "help." Trial Tr. Vol. I at 232. She testified that Ms. Wray initially did not have a shirt on and was wearing only underwear, but that after Ms. Wray jumped out the petitioner's car, she put on her tee shirt. *Id*. at 230. Ms. Belden stated that Ms. Wray had red marks up and around her neck and chest and she was crying. *Id*. at 231. Ms. Belden testified that Ms. Wray told them that the petitioner

stuck a beer bottle in her vagina. *Id*. at 237. Ms. Belden also stated that the petitioner threatened to kill all of them before he drove away. *Id*. at 233.

JoAnn Quinn, a registered nurse at Mecosta County General Hospital, testified that on June 18, 1997 she saw Ms. Wray enter the emergency room crying loudly. Trial Tr. Vol. II at 72. Nurse Quinn testified that Ms. Wray told her that the petitioner had raped her. *Id*. at 73. Nurse Quinn stated that Ms. Wray appeared very frightened and said, "I'm afraid that he will come here to kill me and he will kill my sister." *Ibid*. Ms. Wray told Nurse Quinn that the petitioner inserted a bottle into her rectum and vagina and raped her several times. *Id*. at 77. Nurse Quinn observed that Ms. Wray had abrasions on her face and neck as well as abrasions on her hip, legs, and knees. *Id*. at 75-76, 85. Quinn also observed an egg-sized bruise on Ms. Wray's inner left thigh and saw particles that looked like bits of brush and leaves around her rectum and vagina. *Id*. at 81-82. She did not find any evidence of tearing or bleeding in Ms. Wray's vagina or rectum, but based on her prior experiences in similar cases, an absence of tearing or bleeding was not surprising to her. *Id*. at 94-95.

Michigan State Trooper Paul Stone testified that on June 18, 1997 he and his partner, Trooper Nathan Johnson, were called to the Mecosta County General Hospital and talked with Ms. Wray. Trial Tr. Vol. II at 111. After Wray told them what had happened, they interviewed some witnesses and drove to the scene. *Id*. at 113. Trooper Stone found three Busch beer bottles at the scene of the incident; one of them had what appeared to be pubic hairs on it. *Id*. at 114-15. Trooper Stone obtained a search warrant for defendant's car and found another Busch beer bottle. Tr. Vol. II at 116-17.

Trooper Stone interviewed the petitioner on June 25, 1997. *Id*. at 140. The petitioner told Trooper Stone that he did not know who Ms. Wray was and did not know why he was being arrested. *Id*. at 140-41. Trooper Johnson corroborated some of Trooper Stone's testimony and added that during a later interview the petitioner said he knew a woman named Valerie, but he did not know her last name and had last seen her a month or two weeks earlier at her sister's house. *Id*. at 152.

Ann Hunt, a Michigan State Police forensic scientist, testified that she examined the sexual assault kit, some beer bottles, and clothing Ms. Wray was wearing during the incident. Tr. Vol. II at 156-57. No seminal fluid was detected on any of these items. *Id*. at 158. Ms. Hunt found one hair on one of the beer bottles, but the fineness of the hair indicated that it may not have been a pubic hair. *Id*. at 163.

Mecosta County Deputy Sheriff David Arnson was allowed to testify about prior incident between the petitioner and his wife, Mrs. Woodbury. Deputy Arnson was dispatched to the petitioner's home at 7:30 a.m. on April 14, 1996. Tr. Vol. III at 25, 34. Deputy Arnson found Mrs. Woodbury in a pickup truck with her father, attempting to back out of the driveway. *Id*. at 24, 26. Deputy Arnson testified that Mrs. Woodbury was extremely frightened, shaking, unable to hold her hands still, and "kind of hysterical." *Id*. at 26-27. Mrs. Woodbury told Deputy Arnson that she wanted to leave the area without the petitioner seeing her. *Id*. at 27.

Deputy Arnson noticed rope burns on Mrs. Woodbury's neck and wrists. Mrs. Woodbury told Deputy Arnson that the rope burns were the result of the petitioner "hog-tying" her. Tr. Vol. III at 28-29. Mrs. Woodbury explained to Arnson that the petitioner, who had been drinking heavily, drove her to a swampy area and told her that he would kill her that if she ever tried leaving

him again. *Id*. at 29-30. The petitioner then drove back to their home where he tied her up with some rope. *Id*. at 31. The petitioner also cut off her hair. *Id*. at 31-32. Mrs. Woodbury was able to free herself and escape when the petitioner fell asleep or passed out. *Id*. at 33.

The petitioner testified on his own behalf. He admitted being with Ms. Wray on the day in question. Tr. Vol. III at 65. The petitioner denied touching Ms. Wray sexually and placing a beer bottle in her vagina or rectum. *Id*. at 65-66. The petitioner admitted driving down a two-track road and drinking beer with Ms. Wray, but denied that anything unusual happened. He described the two-track road as "rough." *Id.* at 79. He said:

> It's full of ruts and holes. That particular two-track I know very well. I grew up in the area. It has a few sink holes in it. At that time of year they would have been dry, but they would have been deep holes you would have to traverse around. It's got a hairpin curve in it. It's just generally not the best place to take a car. . . . The terrain is pretty diverse out there. It's both wooded, swampy. There's a couple of open fields on the trail. There's a power line that's all open for the lines to run through. The majority of it is basically wooded. . . . It was just an absolutely gorgeous day out. One of the first nice days of the year. . . . [He and Ms. Wray were] just sitting there talking and enjoying the scenery, drinking beer, just listening to the radio, just generally, you know, hanging out."

Tr. Vol. III at 79-83.

The petitioner testified that he left his vehicle to "take a leak" and saw a "blue herring [sic], a crane," up close for the first time. Tr. Vol. III at 83. Upon returning to the vehicle, the petitioner was shocked and embarrassed to find Ms. Wray was naked with a beer bottle between her legs. *Id*. at 84-85. The petitioner was so embarrassed that he "turned away as quickly as possible." *Id*. at 85. The petitioner decided to drive Ms. Wray home immediately. *Id*. at 86. Before he could leave, a car full of teenagers pulled up. After he had talked to them and had started to pull away, the petitioner noticed that one of them was approaching him with a hand behind his back. *Id*. at 90. At

-6-

the same time, Ms. Wray got out of the car. *Ibid*. The petitioner said he thought it was a set-up to rob him, so he drove away leaving Ms. Wray behind. *Id*. at 91.

On cross-examination, the petitioner admitted that he hog-tied his wife and cut off her hair. The petitioner claimed that she consented to have him do this. *Id*. at 102-04. Asked why Ms. Wray would testify as she did, the petitioner said that perhaps he hurt her feelings by refusing her sexual advances. Tr. Vol. III at 95.

The jury left the courtroom to begin its deliberations at 6:23 p.m., December 11, 1997. At 7:05 p.m. the same day, the jury returned its verdict of guilty of first-degree criminal sexual conduct. Tr. Vol. III at 247, 250. The jury's verdict specified that it found that "[d]efendant affected vaginal sexual penetration with a beer bottle through force or coercion and the victim sustained personal injury." Tr. Vol. III at 254.

The trial court sentenced the petitioner to a prison term of forty to ninety years as a fourth felony habitual offender. On his direct appeal, the petitioner raised the following issues:

I.   The trial court committed reversible error and denied defendant a fair trial by allowing the prosecutor to introduce, over objection, evidence of prior alleged similar acts;

II.  The trial court erred when it admitted the hearsay statements of defendant's wife as excited utterances;

III. Defendant's conviction should be reversed because of the misconduct of the prosecutor;

IV.  Defendant's sentence is disproportionate to the crime committed by the habitual offender and to the offender.

The Michigan Court of Appeals also found an ineffective assistance of counsel argument among the discussions in the brief relating to the prosecutorial misconduct issue. That court nevertheless affirmed the petitioner's conviction and sentence in an unpublished, *per curiam* opinion. *See People*

*v. Woodbury*, Michigan Court of Appeals Docket No. 208974 (June 18, 1999). The Michigan Supreme Court denied his delayed application for leave to appeal. *See People v. Woodbury*, Michigan Supreme Court Docket No. 115150 (March 28, 2000).

On January 26, 2001, the petitioner filed the instant petition for a writ of habeas corpus, presenting the following claims for relief:

I.  Vehicle seized from private property without a warrant.

II.  Statements of the defendant's wife from a prior domestic assault case were used in an action not against or for the wife.

III.  Trial counsel failed to issue subpoenas or call any witnesses to the stand on defendants' behalf.

The respondent has answered the petition and contends that Issue I was not presented to the Michigan state courts, but is not cognizable in federal habeas corpus, and that Issue II was presented to the Michigan state courts as a matter of state evidentiary law, and also is not cognizable in habeas corpus. The respondent has not addressed the merits of the petitioner's third issue, which this Court construes as a claim of ineffective assistance of trial counsel.

II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), govern this case because the petitioner filed this habeas petition after the AEDPA's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). That Act "circumscribe[d]" the standard of review federal courts must apply when considering applications for a writ of habeas corpus raising constitutional claims. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

As amended, 28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Therefore, federal courts are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000); internal quotes omitted). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .

-9-

> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .
>
> [A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409, 410-11. *See also Harbison v. Bell*, 408 F.3d 823, 828-29 (6th Cir. 2005); *McAdoo v. Elo*, 365 F.3d 487, 493 (6th Cir. 2004); *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th Cir. 2003) (en banc); *Lewis v. Wilkinson*, 307 F.3d 413, 418 (6th Cir. 2002).

### III.

### A.

The petitioner first contends that his rights were violated when his vehicle was seized and searched without a warrant. Presumably, the petitioner would argue that any items found in the vehicle should have been suppressed. The respondent asserts that the petitioner never presented this claim to the state courts. Normally, the failure to exhaust state court remedies requires dismissal of the entire petition. *Lyons v. Stovall*, 188 F.3d 327, 333 (6th Cir. 1999) (citing *Rose v. Lundy*, 455

U.S. 509, 522 (1982)). However, the failure to exhaust state remedies is not an absolute bar to federal review when, as here, the federal claims lack merit, because requiring additional proceedings would waste time and judicial resources. *Id*. at 333; *see also* 28 U.S.C. § 2254(b)(2). The Court will excuse the exhaustion requirement in the interest of judicial economy and proceed to address the merits of the petitioner's claims.

At trial, Michigan State Trooper Paul Stone testified that he obtained a search warrant for the petitioner's car before searching it. Tr. Vol. II at 116. This fact was – and remains – undisputed. At the hearing on a motion to suppress evidence held on December 8, 1997, Michigan State Trooper Nate Johnson established that the petitioner's car was seized from the petitioner's property after the petitioner was lawfully arrested upon probable cause to believe he had sexually assaulted Ms. Wray. Motion Hearing Tr. at 9-10. The officers seized the petitioner's car before obtaining a warrant to preserve evidence, as the car was located on the petitioner's property and hostile family members constituted a risk to the integrity of whatever evidence might have been located inside the car. *Id*. at 18-19, 22, 28. The state troopers did not search the car, however, until they obtained a search warrant. *Id*. at 9-10.

At the state evidentiary hearing, defense counsel requested that the evidence obtained from the car be suppressed because the car was initially seized without a search warrant and because items taken from the trunk were never listed in the search warrant. The prosecutor argued that the car was an instrumentality of the crime, and that the exigent circumstances justified the seizure of the vehicle without a warrant. The court found that there was probable cause at the time it was seized to believe that the car was used as an instrumentality of the crime, citing *People v. Cook*, 24 Mich. App. 401; 180 N.W.2d 354 (1970). Motion Hearing Tr. at 43. The court concluded, however, "it certainly is an issue that, in the event the defendant is found guilty, is a wonderful appeal issue." *Id*. at 44.

Even if the merits of the trial court's decision are debatable, the record allows no doubt that the petitioner had a full opportunity to litigate his Fourth Amendment issue in the state trial court. He apparently chose not to raise that issue on appeal, and he has not seen fit to second guess his appellate attorney's strategic choice to focus on stronger issues. Since the petitioner had a full and fair opportunity to litigate this issue in state court, his Fourth Amendment claim is not cognizable on habeas review. *Stone v. Powell*, 428 U.S. 465, 481-82 , 494 (1976) (holding that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial"); *accord Cardwell v. Taylor*, 461 U.S. 571, 572 (1983); *Gilbert v. Parke*, 763 F.2d 821, 823-24 (6th Cir. 1985). A state criminal defendant has a full and fair opportunity to litigate his Fourth Amendment claim when (1) the state's procedural mechanism allows the opportunity to present a Fourth Amendment claim; and (2) the defendant's presentation of his claim was not "in fact frustrated because of a failure of that mechanism." *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982). In Michigan, a motion to suppress evidence may be raised before trial, during trial, and even on appeal. *See People v. Ferguson*, 376 Mich. 90, 93-95, 135 N.W.2d 357 (1965); *People v. Harris*, 95 Mich. App. 507, 509, 291 N.W.2d 97 (1980). "All that *Stone v. Powell* requires is an 'opportunity' for full and fair consideration of the claim for suppression; it is up to the claimant and his counsel to decide what use, if any, is to be made of the opportunity." *Jennings v. Rees*, 800 F.2d 72, 77 (6th Cir. 1986).

In the present case, potentially prejudicial evidence found in the trunk of the petitioner's car was excluded at the pretrial suppression hearing on the basis of relevance. There is no indication that presentation of the petitioner's Fourth Amendment claims was frustrated by a failure of the state

court mechanism. Therefore, the petitioner's Fourth Amendment claim is not cognizable in habeas corpus.

Finally, this Court notes that no damning evidence was found in the search of the petitioner's car. The only potentially inculpatory evidence seized from the car and mentioned at trial was a beer bottle of the same brand found at the scene of the crime on the two-track road. The petitioner has not shown how the suppression this evidence would have made a difference at his trial. The petitioner's Fourth Amendment claim does not entitle him to habeas relief.

B.

The petitioner next contends that admission of "other acts" evidence introduced via hearsay that he drove his wife to a swampy area, hog-tied her, cut off her hair, and threatened to kill her violated his constitutional right to a fair trial. The trial court found that the "other acts" evidence was admissible to show that the petitioner had a common plan or scheme to humiliate and abuse women, and that the hearsay testimony regarding certain parts of the wife's statements after the incident were admissible under the "excited utterance" exception to the hearsay rule.

"Habeas review does not encompass state court rulings on the admission of evidence unless there is a constitutional violation." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994). The Sixth Circuit Court of Appeals has explained that:

> "[E]rrors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are usually not to be questioned in a federal habeas corpus proceeding." *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988). Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) (quoting *Patterson v. New York*, 432 U.S. 197, 202 (1977)); *see also Spencer v. Texas*, 385 U.S. 554, 563-64 (1967).

*Seymour v. Walker,* 224 F.3d 542, 552 (6th Cir. 2000). The Supreme Court has declined to hold that admission of "other acts" evidence is so extremely unfair that it violates fundamental precepts of

justice. *See Dowling v. United States*, 493 U.S. 342, 352-53 (1990). Such matters are more appropriately addressed in codes of evidence than under the Due Process Clause. *Id.* at 352.

In this case, the trial court's admission of the police officer's second-hand account of the assault on the petitioner's former wife likely was erroneous under state evidence law. In order to be admissible, the other act evidence must "be offered for a proper purpose under Rule 404(b)[,] . . . it be relevant under Rule 402 as enforced through Rule 104(b)[,] . . . [and] the probative value of the evidence [may] not [be] substantially outweighed by unfair prejudice." *People v. Crawford*, 458 Mich. 376, 385, 582 N.W.2d 785, 790 (1998). Although the trial court stated that the purpose of the other acts evidence was to show a "common plan" to abuse women, that "common plan" was not probative of a fact in issue in the case other than the commission of the crime itself. The evidence, therefore, would have no other purpose than to prove the petitioner's character or propensity to sexually assault women, an avowed *improper* purpose according to the text of Michigan's evidence rule. *See* Mich. R. Evid. 404(b)(1) (stating that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith"); *see also Crawford*, 458 Mich. at 383-84, 582 N.W.2d at 790 (observing that "[t]he character evidence prohibition is deeply rooted in our jurisprudence. . . . Underlying the rule is the fear that a jury will convict the defendant inferentially on the basis of his bad character rather than because he is guilty beyond a reasonable doubt of the crime charged. Evidence of extrinsic bad acts thus carries the risk of prejudice, for it is antithetical to the precept that a defendant starts his life afresh when he stands before a jury") (internal quotes and citations omitted).

But that evidentiary error did not rise to the level of a due process violation under the federal constitution. The state court of appeals held:

> [E]ven if the trial court did err in admitting this evidence, the error was harmless in light of the other evidence of defendant's guilt. Specifically, the victim's physical condition and demeanor were observed immediately following the alleged assault, and she manifested both physical and emotional signs of having been sexually assaulted. Further, the victim was able to describe the assault in particular detail immediately after it occurred. Finally, four witnesses who happened upon the assault observed the victim in distress, trying to escape from defendant. In light of this untainted evidence of defendant's guilt, we conclude that it is highly probable that the other acts evidence did not contribute to the verdict.

*People v. Woodbury*, Michigan Court of Appeals Docket No. 208974 at 1. This Court cannot say that the harmless error determination was contrary to or an unreasonable application of federal law. *See Chapman v. California*, 386 U.S. 18, 24 (1967) (allowing the state to show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained"); *see also Gutierrez v. McGinnis*, 389 F.3d 300, 306-07 (6th Cir. 2004).

The petitioner also complains that the police officer's rendition of the petitioner's wife's assault story amounted to inadmissible hearsay. The state trial judge believed that the excited utterance exception allowed admission of that testimony. However, that ruling likely was erroneous as well. In order to constitute an excited utterance under Michigan Rule of Evidence 803(2), an out-of-court statement must satisfy the following requirements: "(1) it must arise out of a startling occasion; (2) it must be made before there has been time to contrive and misrepresent; and (3) it must relate to the circumstances of the startling occasion." *People v. Gee*, 406 Mich. 279, 282, 278 N.W.2d 304 (1979). Statements that are the product of questions and interrogation, as in this case, rarely constitute an excited utterance. *See People v. Straight*, 430 Mich. 418, 426 n.6, 424 N.W.2d 257, 260 n.6 (1988) (stating that "[e]vidence that the statement was self-serving or made in response to an inquiry, while not justification for automatic exclusion, is an indication that the statement was the result of reflective thought, and where the time interval permitted such thought these factors

might swing the balance in favor of exclusion") (quoting McCormick, Evidence (3d ed), § 297, p 857).

The wife's statement was made to a police officer during extended questioning, and the proponent of the evidence at trial did not show that was not the product of reflective thought; it probably was not an excited utterance under Michigan evidence law. The Court also notes that the wife never testified at trial. The petitioner never raised an issue under the Confrontation Clause of the Sixth Amendment, *see Crawford v. Washington*, 541 U.S. 36, 52, 68 (2004) (holding that "[s]tatements taken by police officers in the course of interrogations are also testimonial under even a narrow standard," and "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation"), and he now has waived it. But even if the petitioner had raised and exhausted the issue, the state court found the hearsay error to be harmless, and the Confrontation Clause question is susceptible to the same harmless error analysis noted above. *See Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986).

This Court agrees that there is no reasonable probability that the outcome of the petitioner's trial would have been different if the other acts or hearsay evidence had not been admitted. The petitioner has not shown any error in the finding beyond a reasonable doubt that this trial error did not substantially contribute to the verdict; therefore, the Michigan Court of Appeals decision is a reasonable application of controlling federal constitutional law. *See Ford v. Curtis*, 277 F.3d 806, 811 (6th Cir. 2002). This claim does not merit habeas relief.

C.

Finally, the petitioner contends that trial counsel was ineffective for failing to present unnamed witnesses on his behalf. Possibly because the petitioner did not include this argument in all copies of his petition, the respondent neglected to address this claim. The Michigan Court of Appeals rejected the petitioner's ineffective assistance of counsel claim, stating that the petitioner "has failed to show that counsel's performance was objectively unreasonable and that he was prejudiced by counsel's defective performance." *People v. Woodbury*, Michigan Court of Appeals Docket No. 208974 at 2.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth a two-part test for evaluating whether the performance of counsel violates a defendant's rights under the Sixth Amendment. A defendant must first show that the performance of his or her counsel was "below an objective standard of reasonableness." *Id.* at 688. In order to avoid second-guessing trial counsel's strategic decisions, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks and citation omitted). Accordingly, "an ineffective-assistance-of-counsel claim cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken." *Campbell v. Coyle*, 260 F.3d 531, 551 (6th Cir. 2001).

The second condition that must be met is a showing that the counsel's deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 691-92. To satisfy this condition, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

This Court agrees with the state court of appeals' decision that the petitioner failed to show that counsel's performance was deficient and that counsel's performance caused him prejudice.

The petitioner claims that counsel was ineffective because she failed to call unspecified, unnamed witnesses. The Sixth Circuit has held that under some circumstances, the failure to interview or call a potential defense witness may amount to a violation of a criminal defendant's Sixth Amendment rights. *See, e.g., Towns v. Smith*, 395 F.3d 251, 260 (6th Cir. 2005); *Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004); *Blackburn v. Foltz*, 828 F.2d 1177, 1183 (6th Cir. 1987); *Johns v. Perini*, 462 F.2d 1308, 1314-15 (6th Cir. 1972) (applying pre-*Strickland* standard). However, in this case the petitioner has not identified or described any witnesses whom he believes defense counsel should have called. There at least must be some representation in the record or the petition of the contribution a missing witness could have made to the factual inquiry at trial in order to assess, at a minimum, the prejudice prong of *Strickland*'s test. *See Millender v. Adams*, 376 F.3d 520, 526-27 (6th Cir. 2004); *Campbell v. United States*, 364 F.3d 727, 734 (6th Cir. 2004) (holding that the petitioner failed to establish ineffective assistance of counsel where he "failed to provide any information regarding what witnesses should have been examined more fully or what additional witnesses should have been called" (internal quotes omitted)). The claim in this case fails because the petitioner has not suggested the testimony the witnesses would have provided or how that testimony might have undermined confidence in the outcome of the case. *See United States v. Berry*, 814 F.2d 1406, 1409 (9th Cir. 1987). Habeas relief on account of a counsel's failure to present exculpatory evidence should not be granted unless the petitioner has "come forward with

'sufficiently precise information' as to the evidence or testimony that was not brought before the trial court." *United States ex rel. Partee v. Lane*, 926 F.2d 694, 701 (7th Cir. 1991) (quoting *United States ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1016 (7th Cir. 1987)).

Because the petitioner has failed to name or describe the absent witnesses, and he has not provided sufficiently detailed information regarding the evidence, this Court must conclude that the petitioner has failed to prove deficient performance by his trial counsel. Nor has the petitioner shown prejudice. The state court of appeals decision denying the petitioner's ineffective assistance of counsel claim was a reasonable application of federal constitutional law and this claim does not merit habeas relief.

IV.

The Court is not persuaded that the petitioner's conviction and sentence is contrary to, or an unreasonable application of, controlling federal constitutional law, or an unreasonable determination of the facts.

Accordingly, it is **ORDERED** that the petition for writ of habeas corpus is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: November 15, 2005

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 15, 2005.

s/Tracy A. Jacobs
TRACY A. JACOBS